CLARENCE A. MILLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14087. Promulgated October 17, 1928.

*Chester A. Bennett, Esq.*, for the petitioner.
*Brice Toole, Esq.*, for the respondent.

OPINION.

TRAMMELL: The petitioner contends that the respondent erred in accepting the "original or combined" return and rejecting the separate or community returns. In support of this contention the petitioner urges that in 1920 he had a domicile either in the State of Texas or in the State of Tamaulipas, Mexico, and in whichever State his domicile may be determined to have been he was entitled to file a return on a community basis, since there existed in each State a community system of holding property which vested in his wife the right to one-half of his income from the time such income came into existence.

The respondent admits that if it be determined that the petitioner was domiciled in Texas during 1920 he and his wife were entitled to file returns on the community basis provided they were not barred from so doing by the combined and community returns having been

filed at the same time. The respondent contends, however, that the petitioner having filed a combined return and he and his wife having filed community returns at the same time, leaving to the respondent the election as to which he would accept as correct, and he having accepted the joint return, the petitioner's tax liability then became fixed and community returns may not therefore be accepted.

The question of domicile was considered in *Mitchell* v. *United States*, 21 Wall. 350, where the court said:

Domicile has been thus defined: "A residence at a particular place accompanied with positive or presumptive proof of an intention to remain there for an unlimited time." This definition is approved by Phillimore in his work on the subject. By the term *domicile*, in its ordinary acceptation, is meant the place where a person lives and has his home. The place where a person lives is taken to be his domicile until facts adduced establish the contrary.

\* \* \* \* \* \* \*

A domicile once acquired is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation. To constitute the new domicile two things are indispensable: First, residence in the new locality; and second, the intention to remain there. The change cannot be made except *facto et animo*. Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicile for another. Until the new one is acquired, the old one remains. These principles are axiomatic in the law upon the subject.

\* \* \* \* \* \* \*

Among the circumstances usually relied upon to establish the *animus manendi* are: Declarations of the party; the exercise of political rights; the payment of personal taxes; a house of residence, and a place of business.

During the entire 15 years the petitioner was in Mexico he had his home there, and from the time he resigned as consul in 1914 he had his place of business there. While he went to Houston once or twice a year for conferences during the time he was in the employment of the Texas Company, it was not until 1922 that he moved to Texas for the first time. While he testified that after resigning as consul he intended to make Houston his home at such time as he might leave Mexico, there is nothing in the record to indicate that at that time or prior to 1922 he entertained an intention to leave Mexico or to leave there at any particular time. Even though after entering the employment of the Texas Company he considered Houston as his place of residence in the United States and thereafter opened a bank account at that place and during subsequent years filed his income-tax returns at Austin, we do not think these facts when considered in connection with other facts in the case are sufficient to establish that Miller was domiciled in Texas during 1920. The petitioner at most intended to establish his domicile in Texas at a future time. There

is nothing to indicate that during the taxable year he had actually done so. He had never resided there.

The next question is, Had the petitioner established his domicile in the State of Tamaulipas during the taxable year? In examining the question from the standpoint of the law of Tamaulipas, we find that Article 27 of the Civil Code of the Mexican Federal District and Territories, which was promulgated on March 31, 1884, and effective in such district and territories from June 1, 1884, and which was subsequently adopted by the State of Tamaulipas and came into force in that State on September 16, 1896, provides:

> The domicile of a person is the place in which he habitually resides; in default of this, that in which he has the principal seat of his business. Wanting both, the domicile of a person shall be reputed to be the place in which he may be found.

Article 209 of the Code of Civil Procedure for the Mexican Federal District and Territories, which was promulgated on June 15, 1908, and became effective July 1, 1908, provides:

> In order for the residence spoken of in article 27 of the Civil Code to be considered habitual, it should last six months. He who does not wish to lose his domicile should thus manifest to the municipal authority, and said authority will issue a certificate of declaration which will serve as proof in the place in which he has resided longer than that shown by the law to acquire a domicile.

Considering the facts in this case in connection with the above quoted provisions of the law, we are of the opinion that the petitioner met the requirements of domicile in Tamaulipas, and that during 1920 he was domiciled in that State.

With respect to the remainder of the contention relating to the existence in the State of Tamaulipas of a community system of holding property by which there was vested in the petitioner's wife the right to one-half of his income, it will be necessary to determine what law was applicable.

In advising the petitioner of the deficiency involved herein the respondent informed him that he was not entitled to report his income on the community basis according to the laws of Mexico and relied on I. T. 1646, Cumulative Bulletin II–1, p. 145. In I. T. 1646 it is held that in general, married citizens of the United States residing in Mexico are not entitled to report for purposes of income tax upon the same basis as married residents of Texas may report community income. The basis of this holding is a decree issued by Carranza in 1917, in which the community system of marital property was abolished within the Federal District and Territories, with certain reservations applicable to marriages previously contracted.

The record in this case shows that the Law of Family Relations as contained in the Carranza decree referred to above and which

was issued on April 9, 1917, and promulgated on the 12th of the same month was for the Federal District and Territories, and Tamaulipas being a State, it was not included within such district and territories. The record further shows that before the Federal Constitution of 1917 was adopted, and which went into effect on May 1, 1917, the governors of the States were invested during the revolution with all classes of powers, even that of legislation. The constitutional order was reestablished in the Republic on May 1, 1917, and all the Federal agencies recommended to be ruled by the Federal Pact which does not concede to the governors of the States the power to legislate but gives such power to the legislatures of the States. Among the powers granted by the constitution of the State to the governors is not found authority to " issue" laws, which power is reserved to the legislature.

. In this state of affairs and on June 29, 1918, Osuna, the provisional governor of Tamaulipas, issued a decree purporting to put in force in the State the Law of Family Relations which Carranza had promulgated on April 12, 1917, for the Federal District and Territories. When Osuna issued the decree of June 29, 1918, he did not have the power to legislate. While the Supreme Court of Mexico has never passed on the question of the effect or constitutionality of this particular decree of Osuna, it has, however, held that another decree issued by him under similar circumstances was unconstitutional for the reason that he did not have authority to legislate.

Many acts of civil status, including marriages, were performed in accordance with the federal Law of Family Relations which Osuna purported to put into effect by his decree of June 29, 1918. In order to validate the acts performed on the basis of the Law of Family Relations purported to be put into effect by this decree, the legislature of the State of Tamaulipas " issued " a new Law of Family Relations almost identical with the federal law. This new law was promulgated on September 1, 1923, and from that date was in full force and effect. This new law validated only acts of civil status, that is, marriages, divorces, adoptions, etc., which might have been made in accordance with the law as contained in the Carranza decree, but it did not refer in any way to acts based on the relations between the spouses in accordance with the Civil Code, such as properties acquired during marriage. If any attempt had been made in the law of September 1, 1923, to give it a retroactive effect with reference to contracts and deeds made prior to that date, such attempt would have been prohibited by the constitution. (Article XIV.)

The affidavits of two Mexican lawyers of the State of Tamaulipas were put in evidence by agreement of counsel. These lawyers were of the opinion that property acquired by the petitioner during 1920

was community property and was governed by the Civil Code and not by the Law of Family Relations as contained in the Carranza decree issued and promulgated in April, 1917, and adopted by the provisional governor of Tamaulipas on June 29, 1918. Such opinion is based, among other things, on the fact that the petitioner's marriage having been consummated prior to June 29, 1918. the provisions of the Civil Code were applicable, since it was not until 1923 that the Law of Family Relations as set forth in the Osuna decree was actually put into force in Tamaulipas by the only authority capable of making such law—the legislature of that State.

From the record in this case we are of the opinion, since the Carranza decree relating to the Law of Family Relations was not applicable to the State of Tamaulipas, and as the decree of Osuna issued in June, 1918, attempting to put the law of the Carranza decree into effect in Tamaulipas was not constitutional, since this was legislation which he did not have authority to enact, that insofar as the property acquired by the petitioner during 1920 was concerned, it was governed by the provisions of the Civil Code.

Having reached the foregoing conclusion as to the application of the provisions of the Civil Code to the petitioner's income in 1920, we will consider the pertinent provisions of that code, which, with reference to the separate and community property of the spouses, provides as follows:

Art. 1999. Each conjugal partner is the owner of the property which he or she had at the time of celebrating the marriage, and of that which each possessed before that, although not then the owner thereof, if he or she shall acquire same by prescription during the partnership.

Art. 2000. Each is also the owner of the property which he or she may acquire during the partnership by the gift of fortune, by donation of any kind, by inheritance, or by legacy, constituted in favor of one of them alone.

Art. 2008. The following constitute the assets of the legal partnership:

I. All the property acquired by the husband in military service, or by either of the conjugal partners in the exercise of a scientific, mercantile or industrial profession, or occupation, or by mechanical work;

II. Property which arises from inheritance, legacy, or donations made to both conjugal partners without designation of parts; if there should be a designation of parts, and these should be unequal, the products alone of the inheritance, legacy, or donation shall be in common;

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

VII. The fruits, accessions, rents and interests received, becoming due, during the partnership proceeding from the common property, or from the individual property, of each of the consorts.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Concerning the administration of the " legal partnership," the code provides:

Art. 2023. The ownership and possession of the common property belong to both conjugal partners while the partnership subsists.

Art. 2024. The husband can alienate and obligate with an "onerous title" (for valuable consideration) the movable property without the consent of the wife.

Art. 2025. Real estate belonging to the social fund cannot be obligated nor alienated in any manner by the husband without the consent of the wife.

\* \* \* \* \* \* \*

Art. 2031. The wife can only administer by the consent of the husband or in the absence, or through an impediment, of the latter.

Although under the Civil Code the ownership and possession of the common property belong to both conjugal partners during the existence of the "partnership," the husband is the manager and the wife can only administer the affairs of the partnership by the consent of the husband or in his absence or on account of an impediment of his.

On February 26, 1926, the Revenue Act of 1926 went into effect. Section 1212 of that Act provides as follows:

Income for any period before January 1, 1925, of a marital community in the income of which the wife has a vested interest as distinguished from an expectancy, shall be held to be correctly returned if returned by the spouse to whom the income belonged under the State law applicable to such marital community for such period. Any spouse who elected so to return such income shall not be entitled to any credit or refund on the ground that such income should have been returned by the other spouse.

In *R. W. Ramming*, 6 B. T. A. 188, we had occasion to consider the effect of the above quoted provision of the Act and held that this section precluded the respondent from taxing to the husband living in Texas the entire income of the community, where separate returns on the community basis were filed, since it appeared that under the Texas laws the wife's interest was vested rather than contingent. The statutes of Texas (Art. 4622, Vernon's Complete Texas Statutes, 1920) provide:

All property acquired by either the husband or wife during marriage, except that which is the separate property of either, shall be deemed the common property of the husband and wife, and during coverture may be disposed of by the husband only \* \* \*.

With respect to the husband's dominion over the community property, the foregoing provision of the Texas statute gives the husband more power and control than the laws of Tamaulipas, and having decided that a wife takes a vested interest under the Texas law and that the husband and wife are entitled to file separate returns on the community property basis we are of the opinion that she would likewise have a vested interest and a like right under the law of Tamaulipas. Having such a vested interest, section 1212 of the Revenue Act of 1926 precludes the respondent from refusing to accept the separate returns of the petitioner and his wife on the com-

munity property basis, *Juan F. Brittingham*, 13 B. T. A. 375; *R. W. Ramming, supra*, unless the act of the petitioner in filing a joint return at the same time otherwise prevents such acceptance.

The respondent, in support of his contention that since the petitioner filed a combined or joint return at the same time the separate or community returns were filed and he (respondent) having elected to accept the joint return the community returns may not now be accepted, relies on our decisions in *Kunkel & Co.*, 3 B. T. A. 133, and *Herman Einstein*, 10 B. T. A. 240.

The facts in those cases differ very materially from those in the instant case in that in those cases the petitioners had filed their returns and subsequently had sought to have the respondent accept so-called amended returns. From a reading of the petitioner's letter which accompanied the three returns in this case it is apparent that he wished in the first instance by original returns to obtain the benefits resulting from the filing of separate returns on the community property basis. He stated that he believed he was entitled to such benefits and submitted returns on that basis at the same time and in the same envelope with the joint return which he did not desire to file unless it was actually required by law. There is nothing in the record to indicate that at any time the petitioner has made any statement or done any act, which shows that he intended his tax liability to be determined upon any other basis than upon that of the separate returns if he was entitled to return the community income on that basis. In fact, the copy of the notice of the deficiency attached to the petition indicates that he continually contended before the respondent up until the time of the determination that he was entitled to have his liability determined on the basis of the separate returns. From a consideration of the facts in the case in connection with our previous decisions, we are of the opinion that the filing of the joint return at the same time the separate returns were filed does not now prevent the acceptance of the separate returns. Under the law and the facts of this case the right to file separate returns or a joint return was a right given to the taxpayer. The Commissioner is not given the discretion or power to determine in what manner the taxpayer should report the income in an original return. The question of the right of a taxpayer to file returns on one basis after he has once filed them on another basis is not here involved. The law provides a method by which it may be done. The Commissioner is required to compute the tax on the basis of separate returns when those returns are filed according to law. In this case the separate returns were submitted with the request that they be considered the taxpayer's returns, notwithstanding the fact

that the taxpayer, at the same time submitted a joint return on which the tax was to be computed only in the event that the separate returns were not accepted and he was not entitled in law to have his tax computed on that basis. The action of the Commissioner was, therefore, erroneous.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*